**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **MIA HOLLINGSWORTH,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:17-cv-00494-TES** |
| **LM INSURANCE CORPORATION,** | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Without a doubt, the insurer in this case will pay a claim to cover fire damage to Plaintiff's home. But if her house was "wholly destroyed," Plaintiff reaps a windfall of at least $136,000. Unfortunately, there are patently clear cases of a scorching fire engulfing a home so that only charred wood remains; in those instances, one easily concludes such structures are "wholly destroyed." This is not one of those cases.

After a fire and months of back-and-forth between Plaintiff, her insurer Defendant LM Insurance Corporation ("LM"), and various contractors, Plaintiff filed a lawsuit against LM for breach of contract and for bad faith with regard to its duties under the insurance policy.[1] LM moves for summary judgment against Plaintiff on each claim, and

---

[1] In her Prayer for Relief, Plaintiff also seeks an injunction that LM continue to pay her Actual Living Expenses under the insurance policy's "Loss of Use" provision "while this litigation is pending." [Doc. 1 at p. 4].

after consideration of the parties' briefs, statements of material facts, and accompanying exhibits, the Court rules as follows.

## FACTUAL BACKGROUND

Many of the disputed facts of this case revolve around minor issues such as who said what to whom, and in what email or letter was something said or left unsaid. But three facts remain absolutely undisputed: (1) only Plaintiff claims that her home was "wholly destroyed" by fire on September 6, 2017; (2) LM provided the insurance policy in effect at the time of the fire; and (3) "[n]ine months after the fire, Plaintiff still had not commenced any repairs" to her home. [Docs. 1 at ¶ 8; 24-2 at ¶ 41; 26-2 at ¶ 41]. However, the following facts, be they undisputed or disputed (and resolved by the record before the Court), illustrate what the parties believe to be the pivotal issues of this case.[2]

The day after the fire, Plaintiff filed a claim with LM which provides the policy[3] of insurance covering Plaintiff's home located at 988 High Street, Macon, Bibb County, Georgia (the "Property"). [Doc. 1 at ¶¶ 1, 6, 8]; *see also* [Doc. 26-4 at pp. 31–33]. Field

---

[2] The parties' presentation of the sequence in which Plaintiff met with certain contractors or other qualified professionals, or had certain communication with *someone* from LM is extremely confusing. Frequently, only generic titles like "engineer" and "contractor" are used without any further identifying information, and several dates throughout the parties' filings are either unsupported by the materials cited or do not flow in a logical sequence. While the specific dates and the innerworkings between the parties do not provide *per se* material facts to this case, certain relevant dates do aid in the understanding of what exactly transpired. Nevertheless, the Court, for the sake of clarity, painstakingly culled through the record and discerned what it believes to be an accurate unfolding of the events surrounding this case.

[3] The policy provides a limit for damages to the Property in the amount of $502,600.00 and expressly provides that "[LM will pay no more than the actual cash value of the damage until actual repair or replacement is complete." [Docs. 24-2 at ¶¶ 59–60; 26-2 at ¶¶ 59–60]; *see also* [Doc. 14-1 at pp. 10, 23].

Representative Howard Yancey and another LM representative were assigned to Plaintiff's claim, and about eight days after the fire Yancey took photographs of Plaintiff's damaged home. [Doc. 26-3 at pp. 1, 3–6]. At that time, Yancey and Plaintiff did not discuss whether the damages to her home rendered it a total loss. [Doc. 28-1 at 20:24—21:2]. However, given the nature of the damage to the Property, Plaintiff's claim was reassigned from Yancey to one of LM's "large loss" adjusters five days later. [Doc. 26-1 at ¶ 3]; *see also* [Doc. 26-4 at p. 27].

Plaintiff first met with the large loss adjuster—a senior field claims resolution specialist—Keith Kinscherf, on September 21, 2017.[4] [Doc. 26-4 at p. 24]. As with Yancey, Kinscherf also did not discuss with Plaintiff whether her home was a total loss following his initial inspection. [Doc. 28-1 at 22:17–20]. After the inspection, it was Plaintiff's understanding that Kinscherf "was going to write up an estimate." [*Id.* at 23:3–4]. Eight days after its inspection, LM provided Plaintiff with its initial written building repair estimate of $190,299.00. [Docs. 24-2 at ¶ 2; 26-2 at ¶ 2]; *see also* [Doc. 24-5 at p. 48]. Kinscherf also outlined the general claims process, discussed the overall scope of the repairs and their estimated time for completion, and subsequently advised Plaintiff that her Property was not a total loss. [Docs. 24-2 at ¶¶ 3–4; 26-2 at ¶¶ 3–4].

---

[4] The parties disagree as to the date Plaintiff first met with Kinscherf. *Compare* [Doc. 24-2 at ¶ 1] *with* [Doc. 26-2 at ¶ 1]; *see also* [Doc. 24-5 at p. 1]. Although immaterial, disputed dates, certain unsupported contentions, and similar briefing errors tend to engender confusion when courts navigate through factually-saturated records like this one. Nevertheless, a quick review of LM's Claim Log shows that the actual meeting date was September 21, 2017. [Doc. 26-4 at p. 24]; *see also* [Doc. 24-5 at p. 2].

Because Plaintiff was required to choose her own contractor for repairs, she began to obtain estimates from three different companies. [Doc. 28-1 at 23:5–24]. First, Plaintiff met with Ralph Burris from Parker Young Construction ("Parker Young") who also did not discuss with Plaintiff whether "the damages resulted in [her] home being totally destroyed." [Doc. 26-1 at ¶ 10]; *see also* [Docs. 24-2 at ¶ 8; 26-2 at ¶ 8; 28-1 at 26:2–6, 26:25—27:3]. However, that business relationship was short-lived. According to Plaintiff's deposition testimony, Burris was "rude and dismissive," and said that Parker Young would make repairs based off of LM's estimate. [Doc. 28-1 at 26:6–8, 26:22–24]. In light of this exchange, Plaintiff states that she "quickly eliminated [Parker Young]" without having received any estimate from them. [*Id.* at 26:6–10]. Moreover, Burris sent an email to Chuck Butwill (another senior field claims resolution specialist for LM) stating, "After meeting with her[,] I think I will not get involved." [Doc. 26-3 at pp. 13–14, 18]. Following "that experience," Plaintiff claims that she was "having trouble getting three local reputable companies," and it was then that she decided to call LM for contractor recommendations "within [its] network," who recommended Plaintiff's second contractor, Paul Davis Restoration of Central Georgia ("PDR"). [Docs. 26-4 at p. 20; 28-1 at 23:25—24:14, 26:9–10].

During their initial meeting, Doug Blount from PDR provided a verbal ballpark-figure estimate of $325,500.00[5] to repair the smoke damage to Plaintiff's home. *Compare* [Doc. 24-4 at pp. 2–3] *with* [Doc. 28-1 at 28:9–11]; *see also* [Docs. 24-2 at ¶ 11; 26-2 at ¶ 11]. Before PDR would issue its final written estimate, Blount needed to consult with an electrical sub-contractor from B3 Home Innovations ("B3 Home") regarding potential rewiring due to code upgrades. [Doc. 28-1 at 27:20–22, 28:12–23]. Even after Blount received B3 Home's $38,878.55 electrical quote and despite Plaintiff's repeated attempts to receive one, PDR never provided a written estimate. [*Id.* at 27:12—28:4]. And, contrary to LM's contentions, Plaintiff states that Blount never told her that the Property was not a total loss. *Compare* [Doc. 24-2 at ¶ 26] *with* [Doc. 26-2 at ¶ 26].

Plaintiff's third contractor, Sentry Construction Company ("Sentry"), provided a written estimate of $366,599.03 to repair the fire damage but "did not, at any point, provide . . . an opinion that the Property was a total loss." [Docs. 26-8 at pp. 1, 40; 28-1 at 32:7–10]; *see also* [Docs. 24-2 at ¶¶ 13–14; 26-2 at ¶¶ 13–14]. Three days after Plaintiff received Sentry's written estimate, she informed Blount from PDR of her decision "to go with another firm" because she was "more comfortable with a local contractor with local trades who deliver in a more timely and responsive manner." [Doc. 26-3 at p. 21]; *see also*

---

[5] In her deposition, Plaintiff testifies that Blount's verbal estimate "was about [$325,000.00]." [Doc. 28-1 at 28:9–11]. However, in his affidavit, Blount avers that "it would cost roughly $320,000.00 to replace all of the fire damage to the Property." [Doc. 24-4 at ¶ 4]. This $5,000.00 difference is immaterial, but for argument's sake, the Court will give Plaintiff the benefit of all doubt and will assume without deciding that PDR's estimated cost to repair was approximately $325,000.00.

[Docs. 24-2 at ¶¶ 29–30; 26-2 at ¶¶ 29–30]. On November 10, 2017, just before she released PDR, Plaintiff emailed LM, detailing her belief that Georgia's Valued Policy statute, Ga. Code Ann. § 33-32-5(a), applied to her claim. [Doc. 26-3 at pp. 24–25]; *Compare* [Doc. 24-2 at ¶ 31] *with* [Doc. 26-2 at ¶ 31].

At some point after receiving LM's initial repair estimate of $190,299.00, Plaintiff also reached out to Engineered Solutions of Georgia ("Engineered Solutions")[6] to conduct an assessment of her home and sought the opinion of the local building inspector.[7] [Docs. 26-3 at pp. 13–14; 28-1 at 24:5–7]. Plaintiff decided to contact Engineered Solutions after becoming concerned—based on her previous remodeling experience and her "diploma in Carpentry"—about the amount of electrical work and the proposed repairs to her house's foundation and crawl space.[8] [Doc. 26 at p. 3]. About a month later, Kinscherf,

---

[6] Engineered Solutions, sometime following its inspection of the Property, issued its structural engineering report supporting conclusions that "repair" of Plaintiff's house "is feasible." [Docs. 24-2 at ¶¶ 15, 17; 26-2 at ¶¶ 15, 17; 26-3 at pp. 26–29]. And, consistent with LM's request, Plaintiff emailed separate copies of Engineered Solutions' report and drawings to Kinscherf, PDR, and Sentry. [Docs. 26-3 at p. 13; 24-5 at p. 53]; *see also* [Doc. 24-10 at pp. 1–2]. However, notwithstanding LM's own request that Plaintiff "forward" Engineered Solutions' report and estimates to Kinscherf for review, LM issued a check in the amount of $131,693.97 which Plaintiff rejected based on the fact that "she had neither secured estimates from any contractor nor had the foundation of the home inspected by a qualified professional." [Docs. 26-3 at p. 13; 26 at pp. 3–4]; *see also* [Doc. 28-1 at 38:20–39:5].

[7] In early October of 2017, after meeting with the local building inspector, Plaintiff contacted LM to inform it that the city's code upgrade requirements would make "the estimate of repairs [ ] more then [*sic*] half the value of the home." [Doc. 26-4 at p. 21]. Plaintiff explained to LM that according to the local building inspector, the 50% Rule would be applicable to her building permit application. [Doc. 26 at p. 3]; *see also* [Doc. 26-3 at p. 16 ("When the estimated cost of the new work is equal to or greater than fifty percent (50%) of the replacement cost of the existing system, the entire system shall be made to conform to the requirements of the State Minimum Standard Codes for new construction.")].

[8] The Court notes that Plaintiff, while proceeding *pro se*, is a lawyer duly admitted to practice law in the State of Georgia.

after reviewing the report and drawings from Engineered Solutions, prepared and sent Plaintiff a revised written estimate increasing its initial cost of repair from $190,299.00 to $232,698.27, and LM told Plaintiff she could expect an actual cash value payment[9] in the amount of $163,427.95 within five business days. [Doc. 26-5 at p. 2]; *see also* [Docs. 14-1 at p. 4; 24-2 at ¶¶ 34–35; 26-2 at ¶¶ 34–35]. According to Kinscherf, the revised estimate included, among other things, the quote from PDR's electrical sub-contractor and "reflect[ed] an agreed cost of restoration with [PDR]" which was previously set at a ballpark figure of $325,500.00. [Doc. 26-5 at p. 5]; *see also* [Doc. 24-4 at pp. 2–3].

Despite the price difference between LM ($232,698.27) and Sentry's ($366,599.03) estimates, Kinscherf and Cole "agreed to work towards reaching an agreed scope of damages" and developed "a mutual plan to inspect certain exterior walls to investigate for any smoke damage." [Docs. 24-2 at ¶¶ 54–55; 26-2 at ¶¶ 54–55]. However, this inspection never occurred because 38 days after sending her demand letter, Plaintiff filed suit. [Docs. 24-2 at ¶¶ 56–57; 26-2 at ¶¶ 56–57]. During the pendency of this litigation, LM requested Jeff Tarbutton, an engineer with Honest Forensics, LLC, to inspect the Property. [Doc. 24-8 at p. 5]. With the understanding that Plaintiff considered her Property to be "a total loss," Tarbutton visited the Property on August 8, 2018, and

---

[9] This payment was the "second check" LM issued regarding the "undisputed cash value" of the damages. [Doc. 28-1 at 40:4–16]. However, given Plaintiff's position that the amount of damages was "not really settled," because "the contractor and Keith [were] still trying to work on the actual amount," she endorsed the check to Robins Federal Credit Union, who endorsed it to Wells Fargo where it is currently being held in a "construction reserve account." [*Id.* at 40:14–16, 13:22–25, 16:11–18].

performed a visual and photographic survey of the house. [*Id.*]. His report listed detailed findings as well as his conclusion that in his "professional opinion [ ] [the Property] is not damaged to the extent that it should be considered a total loss." [*Id.* at pp. 6–7]; *see also* [Docs. 24-2 at ¶¶ 61–62; 26-2 at ¶¶ 61–62].

Despite receiving multiple assessments and estimates, Plaintiff concedes that she "has not spoken with any engineer or building consultant who has opined"—any different to LM's own advisement—"that the Property was wholly destroyed by fire." [Docs. 24-2 at ¶¶ 32, 36; 26-2 at ¶¶ 32, 36]. At the end of the day, we are left with three cost-to-repair estimates, PDR's ballpark estimate of $325,500.00, Sentry's written estimate of $366,599.03, and LM's revised estimate of $232,698.27. Again, many of the disputes between the parties are immaterial to the Court's decision, however, the Court is fully aware of the intricacies surrounding Plaintiff's issues with certain repair recommendations relating to building materials. But as Plaintiff testifies in her deposition, her "ultimate goal" in this case is to retain the policy limits as contemplated by Georgia's Valued Policy statute and to recover damages for bad faith. [Doc. 28-1 at 98:8–15].

## DISCUSSION

### A.    Standard of Review

LM is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of [her] case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove [her] case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are

implausible." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotations omitted). With the foregoing standard in mind, and with careful consideration of the facts as outlined above and the applicable law, the Court rules as follows.

**B.     Plaintiff's Breach of Contract Claim Against LM**

Plaintiff claims that LM's failure to pay the replacement costs of her Property (in other words, build her a brand new house) gives rise to a breach of contract claim. [Doc. 1 at ¶ 11]. In response to this claim, LM moves for summary judgment arguing that Plaintiff's home is not "wholly destroyed" under Georgia law. If LM is entitled to summary judgment on the issue of whether Plaintiff's home was "wholly destroyed," then it has complied with the portion of the insurance policy requiring it to issue a check for the actual cash value of the damage so that Plaintiff's breach of contract claim fails as a matter of law.

1.     Application of Georgia's Valued Policy Statute When Property Is
        Wholly Destroyed by Fire

LM first argues that there is no genuine issue of material fact as to whether Plaintiff's home was "wholly destroyed" so that Georgia's Valued Policy statute does not apply to her insurance claim. [Doc. 24-1 at pp. 8–11]. This statute provides in relevant part:

> Whenever any policy of insurance is issued to a natural person or persons or to any legal entity wholly owned by a natural person or persons insuring a specifically described one or two family residential building or structure located in this state against loss by fire and the building or structure is *wholly destroyed by fire* without fraudulent or criminal fault on the part of

> the insured or one acting in his or her behalf, *the amount of insurance set forth in the policy relative to the building or structure shall be taken conclusively to be the value of the property . . . .*

Ga. Code Ann. § 33-32-5(a). Stated differently, under Georgia law, when a party proves that a dwelling is "wholly destroyed," she is entitled to the full policy limits, which in this case is $502,600.00.[10] [Doc. 24-1 at p. 9 (citing Ga. Code Ann. § 33-32-5(a))]. The statute is intended to protect property owners from the burden of proving the value of property after it has been "wholly destroyed" by fire, thus entitling a property owner to recover the policy limit. *Marchman v. Grange Mut. Ins. Co.*, 500 S.E.2d 659, 661 (Ga. Ct. App. 1998) ("[The statute] protects property owners from the overwhelming burden of proving the value of property after it has been totally destroyed by fire by 'conclusively' establishing that the value of the property equals the face value of the policy. In this way, a property owner is entitled to the benefits of the insurance coverage without the difficult and perhaps impossible task of proving actual damages.") (emphasis omitted). However, the Valued Policy statute does not apply to an insurance claim if the "building or structure is not wholly destroyed by fire[.]" Ga. Code Ann. § 33-32-5(b)(1).

---

[10] If the Valued Policy Statute applies, Plaintiff receives the full value of the policy, $502,600.00. Assuming the highest repair estimate of $366,599.03, Plaintiff would reap the windfall figure of $136,000 referenced in the introduction.

Both parties agree that Georgia law does not define "wholly destroyed," however, two cases from the Georgia Court of Appeals,[11] as well as a case from this Court, provide exceptional guidance. First, in *Allstate Insurance Co. v. Baugh*, 327 S.E.2d 576, 579 (Ga. Ct. App. 1985), the insurer contended that the trial court erred in charging the jury on Georgia's Valued Policy statute and its effects on recovery, arguing that such a charge was unauthorized by the evidence. In *Baugh*, the home and its contents owned by appellees were destroyed by fire. 327 S.E.2d at 577. The insurance company argued that the evidence at trial established that appellees' home was not wholly destroyed. *Id.* at 579. However, "[t]here being at least some evidence of record that appellees' home was totally destroyed," the Georgia Court of Appeals held that "the trial court's charge based on [Georgia's Valued Policy statute] was proper." *Id.*

Second, in *Georgia Farm Bureau Mutual Insurance Co. v. Brown*, the Georgia Court of Appeals reviewed a trial court's denial of an insurer's motion for judgment notwithstanding a jury's verdict allowing a plaintiff to recover the policy limits when a fire "destroyed" his home. 385 S.E.2d 87, 90 (Ga. Ct. App. 1989). The "'old house' that was owned by [Brown's] grandparents" was determined by the jury to be wholly destroyed. *Id.* at 88, 90. While *Brown* provides little assistance by way of describing the

---

[11] When determining the law of Georgia, this Court "must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issues otherwise." *Camacho v. Nationwide Mut. Ins. Co.*, 188 F. Supp. 3d 1331, 1348 (N.D. Ga. 2016) (quoting *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982)), *aff'd*, 692 F. App'x 985 (11th Cir. 2017).

extent and nature of the damage to the "old house," the Georgia Court of Appeals held

that Brown's

> evidence showing that it would cost more to repair the house than to replace it and photographs submitted into evidence [by the insurer] showing that the house was substantially gutted by the fire was sufficient to authorize the jury's finding that the house was 'wholly destroyed by fire' as contemplated by [Georgia's Valued Policy statute].

*Id.* at 90.

Finally, in 2011, this Court decided the case of *Huckaby v. Travelers Prop. Cas. Co. of Am.*, in which the plaintiff sought "to recover the entire . . . [p]olicy limit[] for the fire loss on the Huckaby Road house." No. 5:10–CV–299(MTT), 2011 WL 6300569, at *8 (M.D. Ga. Dec. 16, 2011). To support his claim, the plaintiff argued that "the Huckaby Road house was completely demolished," because even though "two-thirds of the house ha[d] the walls standing," the walls "[o]n the backside of the master bedroom . . . [were] gone." *Id.* (internal quotations omitted). Essentially, according to the plaintiff in *Huckaby*, "[y]ou [could] see straight through the house." *Id.* Applying the guidance from *Baugh* and *Brown*, the Court held that "an issue of fact exists if there is some evidence that the home his wholly destroyed, photographs or testimony that the home is substantially gutted, or evidence showing it would cost more to repair the house than to replace it." *Id.* at *9.

Under this legal backdrop, the Court considers whether there is some admissible evidence, in this case, to create a genuine issue of material fact as to whether Plaintiff's Property is "wholly destroyed."[12]

2.      The Evidence

The only precedential case discussing sufficiency of the evidence is *Brown*, where the Georgia Court of Appeals found that evidence showing repair cost to be higher than replacement cost and photographs showing that a structure is substantially gutted was sufficient to support a jury's determination that the house was "wholly destroyed." 385 S.E.2d at 90. Here, Plaintiff presents neither of those things: she has no figure to assess whether the cost to repair exceeds the cost to replace and the photographs in the record simply do not show that the Property was substantially gutted by the fire.

Plaintiff, however, contends that she "has both evidence showing that it would cost more to repair her house than to replace it and photographs and other evidence showing that her home has been substantially gutted by the fire due to the damage of structural components of the foundation . . . ." [Doc. 26 at p. 8]. Her argument that Georgia's Valued Policy statute applies, rests on her "prior experience with remodeling

_____

[12] Clearly, LM has shown through citations to the record, including affidavits, exhibits, and admissions by both parties, that the damage to the Property does not render it a total loss. *See, e.g.*, [Docs. 28-1 at 32:7–10 (". . . [Cole never] provided an opinion on whether he thought it was a total loss."); 24-5 at p. 6 ("[Kinscherf] advised [Plaintiff] that the [P]roperty was nowhere near a total loss[.]"); 24-2 at ¶ 17 ("The report and drawings [from Engineered Solutions] support that repair is feasible.")]. But, most notably, Plaintiff herself admits that "[no] engineer or building consultant [ ] has opined that the house is wholly destroyed by fire." [Doc. 28-1 at 66:25—67:3].

historic homes in the area," "a diploma in Carpentry[13] . . . which[ ] includes a certification in framing," real estate estimates from Zillow.com and Realtor.com, a tax appraisal from qPublic.net, estimates of building costs from an unnamed person from the Home Builders Association of Middle Georgia, and photographs showing fire damage to her home.[14] [Doc. 26 at pp. 3, 8–9].

Specifically, Plaintiff argues that "a search of Zillow.com reveals" that homes on High Street, similar in size and condition (before the fire) to her home, sell from anywhere

---

[13] To the extent Plaintiff is offering her "prior experience with remodeling historic homes in the area," in addition to her "diploma in Carpentry . . . which[ ] includes a certification in framing" as a basis on which she is entitled to present certain values regarding the cost of new construction, she fails to meet the standards for expert witnesses under Federal Rules of Evidence 702, 703, and 705. [Doc. 26 at p. 3]. These brief criteria do not tell the Court the depth or breadth of her prior experience or how she gained such experience. Most importantly, if Plaintiff is attempting to lay some sort of "expert foundation," the record is devoid of any report she might use to support any expert testimony she might possess. *See* Fed. R. Civ. P. 26(a)(2).

Not as a discredit to her education itself, but to the lack of Plaintiff's foundation and methodology, LM rightfully challenges these qualifications as insufficient. After reading LM's hearsay-based attack on her proffered property estimates (discussed below), Plaintiff did not move the Court for leave to file a surreply in an effort to buttress her potential ability to give expert testimony and then, down the line, potentially admit each estimate or form an opinion based on the values provided. *See* LR 7.3.1(C), MDGa. She offers nothing to the Court to determine whether she could be permitted to give her own expert opinion or possibly—for Rule 703 purposes—rely on the values listed in the estimates (both property value and new construction costs) from her various sources. Accordingly, Plaintiff's testimony, if any, under Federal Rule of Evidence 701, could be admitted only for the very narrow and limited purpose of lay opinion testimony. But, as a property owner, she would only be permitted to provide her lay opinion regarding her property's value. *See U.S. v. An Easement and Right-of-way Over 6.09 Acres of Land*, 140 F.Supp.3d 1218, 1236–44 (N.D. Ala. 2015). However, "property value" is not the sum Plaintiff needs in order to prove her case. She needed to show the cost of new construction.

[14] According to LM, Plaintiff claims that "the Property is a total loss based on her calculations that the cost of construction of new homes in the area exceeds the $366,599.03 estimate prepared by Sentry." [Doc. 24-1 at p. 9]; *see also* [Doc. 26-8 at p. 40]. This representation of her claim is incorrect. In actuality, Plaintiff argues the opposite—it would cost *less* to build her a brand-new house than it would to repair the damages to her current home.

between "$183,700.00 and $222,250.00." [Doc. 26 at p. 9]. And, from Realtor.com she presents the current estimated value of her home to be $201,688.00. [Doc. 26 at p. 8]; *see also* [Doc. 26-9 at p. 7]. She further contends, via a printout from qPublic.net (which she labels as a Bibb County Tax Assessment), that her home has a "current tax appraised value" of $131,439.00. [Doc. 26 at p. 8]; *see also* [Doc. 26-9 at p. 6]. Using these numbers and her repair estimates, Plaintiff makes the argument that she could "replace her home with an existing similar home in the same area for less than the cost of repair." [*Id.* at p. 9].

LM responds that all of Plaintiff's arguments attempting to create issues of fact are due to be rejected given her deficiencies in methodology and foundation. *See* [Doc. 26 at pp. 3, 8–9] *in connection with* [Doc. 27 at pp. 1–3]. Primarily, LM takes issue with the fact that there is no sworn affidavit from the appraiser to authenticate the 2015 tax appraisal and contends that information presented in Plaintiff's internet sources is wholly unreliable and constitutes inadmissible hearsay. [Doc. 27 at pp. 1–3]; *see also* [Doc. 26-9 at p. 6]. The Court agrees.

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999)). However, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible

form." *Id.* at 1293–94 (quoting *Macuba*, 193 F.3d at 1323); *see also* Fed. R. Evid. 801. To that end, federal evidence rules except from the rule against hearsay "market compilations generally used and relied upon by the public." Fed. R. Evid. 803(17). Even still, Plaintiff's estimates from Zillow.com and Realtor.com are inadmissible. They are quintessential hearsay. *See In re Cocreham*, No. 13–26465–A–13J, 2013 WL 4510694, at *3 (Bankr. E.D. Cal. Aug. 23, 2013) (citing Fed. R. Evid. 803(17)). As in *Cocreham*, Plaintiff lays no foundation to establish that the values reported by Realtor.com and Zillow.com falls within the hearsay exception, and consistent with only the bankruptcy court's holding as to the estimates from Zillow.com, the Court in this case also doubts that such a foundation could be laid. 2013 WL 4510694 at *3.

Courts have held sites like Zillow.com and Realtor.com to be "inherently unreliable" because they are "participatory site[s]" which allow homeowners "to input or change specific entries," much like Wikipedia allows the general public to edit its entries. *Id.* "A homeowner with no technical skill beyond the ability to surf the web can log [into] [Zillow.com] and add or subtract data that will change the value of [her] property." *See id.* (citing *In re Darosa*, 442 B.R. 173, 177 (Bankr. D. Mass. Nov. 17, 2010)).

Even if these estimates could be reduced to admissible form, they are largely irrelevant. *See* Fed. R. Evid. 401. Plaintiff's submission of these internet-based estimates is misplaced for the simple fact that they have the price of the real property baked into their price. Plaintiff already owns the dirt on which her house sits. These estimates show

a home's purchase price, including the value of the house as well as the property on which it sits, not the cost of new construction. Thus, these submissions, even if they were reliable, are completely irrelevant to determine the cost of new construction in the area.

Next, the Court turns to Plaintiff's similar internet-based estimate from qPublic.net. [Doc. 26-9 at p. 6]. Plaintiff labels this $131,439.00 "current tax appraised value" as a "Bibb County Tax Assessment," but as LM points out, Plaintiff does nothing to authenticate[15] it for purposes of reliability. [Docs. 26 at p. 8; 27 at p. 3].]; *see also* [Doc. 26-9 at p. 6 (indicating that the value listed "is for tax purposes only")].

Aside from LM's argument related to authentication, Plaintiff also cannot overcome the relevancy hurdle imposed by Federal Rule of Evidence 401. Specifically, like her other submissions, the listed estimate from qPublic.net shows the *value* of her home—not the cost of new construction, which is the required number Plaintiff needed to prove her case.[16]

---

[15] Documents must be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial. *See* Fed. R. Civ. P. 56(c); *Jones*, 683 F.3d at 1293, *supra*.

[16] "[I]t is not the burden of the Court to sift through discovery and the record in an attempt to find facts that might support one side or the other." *U.S. v. Middleton*, 276 F. Supp. 1352, 1358 n.6 (M.D. Ga 2017) (citation omitted). Further, Federal Rule of Civil Procedure 56 "would mean nothing if district courts were required to mine the record, prospecting for facts that [one party] overlooked and could have, but did not, bring to the surface," thereby burdening district courts with the task of digging through the record "which would shift the burden of sifting from the parties to the courts." *Id.* (quoting *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)).

However, Plaintiff does contend that at the time she filed suit, the cost of new construction—the cost to replace her current house with a newly built home—ranged between $100.00–$112.00 per square foot.[17] Plaintiff states that this price range "was provided by the Home Builders Association of Middle Georgia and confirmed by new construction properties currently listed on the market at the time of the fire. [Doc. 26 at pp. 8–9]. Using these price range values, the cost to replace Plaintiff's home ranges between $279,700.00 and $313,264.00. *See* [*Id.* at p. 9]. Thus, Plaintiff definitively concludes that her home is a total loss when comparing her retained estimates.[18]

Moreover, the declarant who provided the cost-of-new-construction estimate is unknown. In fact, Plaintiff testified at her deposition that she "spoke with the secretary" from the Home Builders Association of Middle Georgia and that "[the secretary] gave [her] those numbers," but she cannot recall her name. [Doc. 28-1 at 97:8–13]. This provides a textbook example of a statement made by a declarant while not testifying at a trial or hearing and subject to cross-examination. Fed. R. Evid. 801(c)–(d). Plaintiff makes no discernable argument that this unknown secretary is qualified to provide cost-of-new-construction estimates, thus she would be incapable of reducing such testimony to admissible form at trial. Accordingly, the sums provided by an unknown and unnamed

---

[17] The square footage of Plaintiff's home is 2,797 square feet. [Docs. 26-3 at p. 25; 26-9 at pp. 3, 5].

[18] Any argument that one repair estimate should be used over another to determine whether the cost of repair exceeds the cost to replace is without merit. It is clear that because Plaintiff cannot show the cost of new construction in the area, she cannot show the cost to replace her home. Some replacement value is vital to Plaintiff's case and without it, she cannot show that her home was "wholly destroyed."

individual working as a secretary for the Home Builders Association of Middle Georgia are unequivocally hearsay and must be excluded.

Lastly, Plaintiff argues that photographs in the record show that "her home has been substantially gutted by the fire," and that these photographs are sufficient to create a genuine issue of material fact to preclude summary judgment in favor of LM. [Doc. 26 at p. 8]. While many photographs in the record show areas of a traditional historic home "undergoing" a "cosmetic remodel" with no fire damage, some show extensive fire damage to the Property's "dining room area."[19] [Doc. 14-1 at pp. 139–53; *see also* [Doc. 26-3 at pp. 7–12]. However, despite the clearly visible char throughout certain areas of Plaintiff's home, no one—aside from Plaintiff herself—takes the position that these photographs show "substantial gut."

To be considered a "total loss," Georgia law does not require the structure to be completely dilapidated. *See Huckaby*, 2011 WL 6300659, at *9 ("There is no Georgia case law supporting [the insurer's] contention that there can be no total loss so long as a remnant of the structure is standing."). Here, no one makes the contention that Plaintiff's house is "physically" dilapidated beyond recognition. Notwithstanding Plaintiff's argument to the contrary, the record clearly demonstrates that Plaintiff's home is still standing and supported by all pre-existing walls. Thus, when considering *all* of the

---

[19] The record shows that Plaintiff was in the process of remodeling her home prior to the fire. Hence, some photos show exposed walls and similar repairs consistent with a remodel, but other photos clearly show extensive fire damage.

photographs of Plaintiff's home, following the fire, and because the damage to her home was largely interior, no reasonable jury could find that Plaintiff's home was wholly destroyed. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

As alluded to above, Plaintiff cannot present sufficient evidence to show that her home was "wholly destroyed." Her failure to submit admissible evidence detailing the cost of new construction in the area is fatal to her claim. Without a replacement-cost value, there is no way to determine whether the cost to replace is actually less than the cost to repair. And, because the photographs in the record do not show that her Property was substantially gutted by the fire, LM is entitled to summary judgment as to Plaintiff's breach of contract claim.[20]

---

[20] Plaintiff moved for an injunction in her Prayer for Relief. [Doc. 1 at p. 4]. Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Clearly, Plaintiff failed to meet the minimal requirements set out in this rule. Regardless of whether this pleading deficiency alone would entitle LM to prevail on summary judgment, the Court nonetheless considered the parties' arguments.

C. **Bad Faith**

Insurers like LM are liable for damages and attorney's fees when its insured can show a bad faith refusal to pay a claim. The plain language of Ga. Code Ann. § 33-4-6(a) provides:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer . . . .

Georgia courts have interpreted this statute to impart liability to an insurance company when "it fails to pay a covered loss within 60 days after a demand for payment has been made *and* there has been a finding that the refusal to pay was in bad faith." *Brown v. Ohio Cas. Ins. Co.*, 519 S.E.2d 726, 727 (Ga. Ct. App. 1999))]. This statute provides the exclusive

---

The insurance policy's "Loss of Use" provision covers "any necessary increase in living expenses incurred by [Plaintiff] so that [her] household can maintain its normal standard of living." [Doc. 14-1 at p. 17]. Payment under this provision is "for the shortest time required to repair or replace the damage or, if [Plaintiff] permanently relocate[d], the shortest time required for [her] household to settle elsewhere." [*Id.*]. The fact that Plaintiff chose not to utilize the cash value payment from LM because she believed that Georgia's Valued Policy statute applied to her case is not "insurance-repair related." [Doc. 14-1 at p. 5 ("[I]f you feel an extension is necessary, we will need a letter signed by your contractor indicating what caused the delay and if it is "insurance-repair related.")]. The Court previously denied Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction seeking to extend her temporary housing lease and coverage for living expenses, and any subsequent argument that the terms of the insurance policy are ambiguous is without merit. [Docs. 13, 15]. The language of the insurance policy clearly provides that payment will be "for the shortest time" possible and the record clearly shows that LM paid for Plaintiff's living expenses during the estimated six-month repair period. [Doc. 14-1 at p. 17]. Furthermore, it would be inequitable, in light of the Court's ruling in this Order, to allow Plaintiff to file her lawsuit—without having commenced a single repair to her house—and require LM to cover her living expenses "while this litigation is pending." [Doc. 1 at p. 4]. Accordingly, Plaintiff is not entitled to any additional living expenses incurred after June 5, 2018, the end date of her six-month temporary housing lease, and her request for a permanent injunction is **DENIED**.

remedy for bad faith damages and was enacted with the purpose "to penalize insurers that delay payments *without good cause*." *Id.* (emphasis added); *see also Principle Solutions Grp., LLC v. Ironshore Indemnity, Inc.*, No. 1:15-CV-4130-RWS, 2016 WL 4618761, at *5 (N.D. Ga. Aug. 30, 2016). However, because the statute allows for the imposition of a penalty, it is strictly construed and a proper demand for payment is essential to recovery. *Id.* at 727–28.

In this case, it is undisputed that Plaintiff made a proper demand for payment via email to LM on November 10, 2017. [Doc. 26–3 at pp. 24–25]. In pertinent part, Plaintiff's demand states,

> This offer to resolve the claim, by its terms, is expressly withdrawn at the close of business on the 30th day following your receipt of this letter. After that time, I will take the position that the insurer has failed to protect its insured and thus acted in bad faith.

[*Id.* at p. 25]. Plaintiff contends that LM acted in bad faith by (1) refusing to include payment for the smoke damage caused by the fire that might have penetrated the walls of Plaintiff's home; (2) refusing to follow the recommendations of Engineered Solutions regarding the proper materials to be used to repair the house's foundation; (3) prematurely discontinuing her Loss of Use coverage; (4) misrepresenting what was

actually included in its revised repair estimate; and (5) failing to adjust the claim for diminished value.[21] [Doc. 26 at p. 19].

LM responded to Plaintiff's demand on December 14, 2017. [Doc. 14-1 at pp. 4–6]. LM's settlement stated that Kinscherf could work with Plaintiff's contractor of choice, presumably Sentry, in reaching an agreed upon cost of repair. [*Id.* at p. 2]. But, as the record demonstrates, any proposed meeting between LM and Plaintiff's contractor of choice was severed when she filed suit.

As discussed above, the record is also clear that LM did not, in fact, refuse to pay. *See* n.9, *supra*. LM issued its cash value payment, and the only reason that payment was not accepted was because Plaintiff and LM did not agree on the amount of damages given Plaintiff's desire to have Georgia's Valued Policy statute apply to her claim. In light of the circumstances surrounding this case and the convoluted back-and-forth between Plaintiff and all those involved, it was not "unreasonable" or "unfounded" for LM await this Court's decision to determine the coverage required by the insurance policy.

___

[21] LM asserts that Plaintiff makes new allegations regarding the basis of her claim for bad faith. [Doc. 27 at p. 9 (citing [Doc. 26 at pp. 19–21])]. LM states that "Plaintiff has previously never claimed that LM misrepresented what was actually included in the repair estimates or that LM failed to adjust the claim for diminished value." [Doc. 27 at p. 9]. Plaintiff does allege in her Complaint that "[LM] purportedly omitted the construction recommendation of [Engineered Solutions] from its estimate to deflate said estimate and avoid . . . payment of the claim in full," which could arguably assert misrepresentation claim, LM is correct that she never mentions a failure to adjust for diminished value. [Docs. 1 at ¶ 12; 26 at p. 19]. Her Complaint clearly establishes a general breach of contract claim [Doc. 1 at ¶ 11], but it does not put LM on notice that she is asserting said claim based on an alleged failure to assess for diminished value—and the Court will not permit her to assert such a claim now. "At the summary judgment stage, the proper procedure for [a] plaintiff to assert a new claim is to amend [her] complaint in accordance with [Fed. R. Civ. P. 15(a)]. A plaintiff may not amend her complaint through argument in a brief opposing summary judgment. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

*International Indem. Co. v. Collins*, 367 S.E.2d 786, 788 (Ga. 1988) (citations omitted) ("Ordinarily, the question of good or bad faith is for the jury, but when there is no evidence of unfounded reason for the nonpayment, . . . the court should disallow imposition of bad faith penalties. Good faith is determined by the reasonableness of nonpayment of a claim."); *see also Ironshore*, 2016 WL 4618761, at *5 (quoting *Lawyers Title Ins. Corp. v. Griffin*, 691 S.E.2d 633, 637 (Ga. Ct. App. 2010)) ("whether the insurer engaged in bad faith, an insured must show by evidence that 'under the terms of the policy upon which the demand is made and under the facts surrounding the response to that demand, the insurer had no "good cause" for resisting and delaying payment.'"). Accordingly, the facts of this case demonstrate that LM had good cause to withhold a full policy limit payout and therefore is entitled to summary judgment on Plaintiff's bad faith claim as well.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** LM's Motion for Summary Judgment [Doc. 24]. Accordingly, the Court **DIRECTS** the Clerk of Court to enter final judgment in favor of LM Insurance Corporation dismissing all claims against it.

**SO ORDERED**, this 8th day of March, 2019.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**